CLYDE V. HASTINGS, Administrator of the Estate of CHARLES T. KEYES, Deceased, RUTH TAYLOR, MARJORIE KEYES SPARKS, and RUSSELL L. KEYES, a Person of Unsound Mind, by MARJORIE KEYES SPARKS, his Guardian, Appellants, v. WALTER HUDSON and PETER HUDSON, Respondents, No. 41482—224 S. W. (2d) 945.

Division Two, November 14, 1949.

Motion for Rehearing or to Transfer to Banc Overruled, December 12, 1949.

*Ellis Beavers* for appellants.

914

William S. Hogsett, Alvin C. Trippe, Hale Houts, Hogsett, Trippe, Depping, Houts & James and Lewis W. Sanders for respondents.

WESTHUES, C.—This suit was instituted by Marjorie Keyes Sparks as guardian of her father, Charles T. Keyes, who had been declared of unsound mind, against the defendants, Walter Hudson and Peter Hudson, to set aside transfers of both real and personal property. The trial court denied plaintiffs any relief and an appeal was taken.

After the case had been tried, and on August 31, 1948, Charles Keyes died. The action was revived in the name of his administrator, Clyde V. Hastings, and the only heirs and children of Keyes by a former marriage, namely, Marjorie Keyes Sparks, Ruth Taylor, and Russell L. Keyes, a person of unsound mind, by his sister Marjorie as his guardian.

The transfers sought to be set aside were made by Charles Keyes' second wife who was the sister of Walter and Peter Hudson. The first wife of Keyes, the mother of the children above-named, died many years ago. Keyes married Cora Lou Hudson in 1933. The transfers of property in question were made beginning in November 1945 and continuing through 1946 and 1947. Mrs. Keyes died in January 1948 at the age of eighty-one. The defendants say that the transfers were made for a valuable consideration, it being their agreement to take care of their sister, Mrs. Keyes, for the remainder of her life. Plaintiffs claim that the real purpose was to cheat and defraud Keyes of his marital rights under Section 324, R. S. Mo. 1939, Mo. R. S. A. There were no children born of the second marriage so Keyes would have inherited one-half of all property belonging to his wife at the date of her death. The property transferred included that which Mrs. Keyes owned at the time of her marriage and that which came to her by inheritance through the Hudson family after her marriage. It was her separate property as defined by Section 3390, R. S. Mo. 1939, Mo. R. S. A.

For a better understanding of the case it will be necessary to relate a short history of the various parties concerned. In the Hudson family there were eight children who lived on a farm near Grant City, Missouri. Most of the children lived to a ripe old age. Only three married; the others lived together on a farm and the

record justifies the statement that theirs was a closely united family. All property was considered community property and was used by the sisters and. brothers as such. Cora Lou was sixty-five when she married Keyes who was about the same age. The boys looked after the farms and business matters. All money was deposited in a bank in the name of the one who was considered the general manager. In May 1942 one of the brothers, O. B. ("Tute"), died; another named Mark ("Brick") died in February 1943; Ada, a sister, died in January 1946. That left only the defendants, Walter ("Tink") and Peter ("Pete") and Mrs. Keyes. After Ada's death, the home was closed and the defendants lived at a hotel in Grant City. During these latter years Walter seems to have had the general management of the affairs. He was the administrator of the estates of O. B., "Brick", and Ada. The Keyes family lived in a home owned by O. B. The record shows that O. B. wanted the Keyes to have the home as long as they lived.

Walter Hudson testified with reference to the manner in which he conducted the business after he took charge. Note his evidence.

"Q. 'And how did you conduct that from there?'

"A. 'Well, I just went ahead the same as any farmer would.'

"Q. 'That is, you managed it all?'

"A. 'Well, practically all.'

"Q. 'And what did you do with the money that came from it?'

"A. 'I put it in the bank.'

"Q. 'Put it in your own personal account?'

"A. 'Yes, sir.'

"Q. 'Put it all there in your personal account?'

"A. 'Well, I don't know as I put it all there, the bulk of it.'

"Q. 'Well, you didn't give Pete his part?'

"A. 'Well, I told the members of the family that I had it there and any money that they wanted, it was there and they could have it.'

"Q. 'But you did not give Lou any of her part?'

"A. 'No, sir.'

"Q. 'You just told them that it was there in the bank in your name and when they wanted it to ask you for it?'

"A. 'Yes.' "

If a dispute ever occurred among the brothers and sisters over property matters, it was not referred to in the trial of this case. After Lou married Keyes, he was treated as a member of the family and frequently visited the Hudson home. The wood supply, as well as some vegetables, needed in the Keyes home was taken from the Hudson land.

Keyes had been a rural mail carrier and had retired on a pension of $93 per month. This pension was the principal source of support for the Keyes household. The evidence disclosed that Keyes never

had accumulated much property. It was in evidence that he had about $2,000 in a bank during 1947. In 1943 Keyes suffered with a stroke which incapacitated him to a great extent and affected his speech so it was difficult to carry on a conversation with him. In 1947 his daughter was appointed as his guardian. Mrs. Keyes, while apparently in good health, was suffering with a heart ailment for which she was being treated by a doctor. The doctor testified that he cautioned Mrs. Keyes about her heart condition ten years before she died. Her death was due to this heart ailment. The death of two of her brothers was due to heart illness. The doctor testified further that Mrs. Keyes was much concerned about her heart condition.

The defendant Walter Hudson carried an account in a bank under his name identified as a special account in which he deposited money belonging to Mrs. Keyes. In December 1945, when the transfers of property here in question were made, there was over $7,000 in this account. It was subject to being checked out by defendant Walter Hudson and by no one else. Walter also invested $10,000 of Mrs. Keyes' money in government bonds. They were ▆▆▆ issued in the name of their sister, Ada. It was admitted that the bonds and the money in the special account were the property of Mrs. Keyes. The bulk of this money had come to her by inheritance. Mrs. Keyes had also inherited an interest in the real estate owned by the Hudsons. We believe the above sufficient to reveal the surrounding circumstances for an understanding of the events that gave rise to this lawsuit.

There was some evidence that Mrs. Keyes did not have much love for the children of Keyes, in particular the daughter Marjorie. More of that hereafter.

On November 27, 1945, Mrs. Keyes and her two brothers (the defendants) met by appointment at a bank in Grant City. The cashier of the bank and John Ewing, an attorney, were also present. It was at this meeting that the transfers of the personal property were made. A check was drawn for the exact amount in the Walter Hudson special account and signed by both Walter and Mrs. Keyes. The bonds in the name of Ada were obtained and these and the check were divided into two packages, placed in envelopes, and delivered to Walter and Peter Hudson by Mrs. Keyes. Mr. Ewing prepared a deed conveying Mrs. Keyes' interest in the real estate to Walter and Peter. This deed was not executed and delivered until February 1946. The deed was not recorded until after Mrs. Keyes' death. Ada died in January, therefore, the share Mrs. Keyes inherited in the real estate from Ada passed to Walter and to Peter by this deed. Mrs. Keyes also had a share in Ada's personal property. She received checks from Walter as administrator of Ada's estate as follows: September 1946 . . . $7,000; December 1946 . . . $800; May 1947

. . . $90.32. These checks were endorsed by Mrs. Keyes and Walter deposited the money to his own credit in a bank. Mrs. Keyes received after November 1945, from the estate of her brother O. B., checks in the amounts of $377.67 and $113.44. She had previous to November 1945, that is, in October, received a check from this estate in the sum of $6,650. After an illness of about a year, Mrs. Keyes died on January 4, 1948. She had at the time a small amount of personal property and $351 in a bank. This suit was filed soon thereafter.

In a deposition taken by plaintiffs both defendants testified concerning the transfers of the property to them. In their depositions both defendants testified with reference to the reasons given by their sister Lou for desiring to make the transfers. Note the evidence of defendant Peter Hudson.

"Q. 'Did Lou tell you she wanted to give the land to you?'

"A. 'She said she was going to.'

"Q. 'Said she was going to give you the land?'

"A. 'Yes.'

"Q. 'Did she say why?'

"A. 'She said she wanted to dispose of it and she said Marjorie was a bad actor.'

"Q. 'What was her words that gave you the impression Marjorie was a bad actor?'

"A. 'She said she was a bad actor. She said she cursed and abused her and she was determined she was not going to give her her estate or any part of it.'

"Q. 'She wanted to get the land so Marjorie would not get it through Charley?'

"A. 'Yes, she said Charley was in bad shape and got a pension of less than a hundred dollars and she said it would take care of him as long as he lived and she said she wanted to dispose of her land and to dispose of her money and she said she had made up her mind she would give it to Walter S. and I and I told her, "Let's go a little slow." She might need it and she had better just keep it and thought there was no need of being in a hurry and I thought she ought to keep her part of the estate until she died and she didn't talk about the amount of land. She owned quite a lot of land in Kansas and under their law the widow gets it.'

"Q. 'You are talking about the land that came out of O. B.'s estate?'

"A. 'Yes and he had about five hundred acres of land in this county and in other counties and we just talked along like that and like you and I talked here and she passed it and then she tackled me again.'

"Q. 'Some time after that?'

"A. 'Two or three months.'

"Q. 'What did she say about it at that time?'

"A. 'Similar to the previous talks. She said she wanted to dispose of it and she was determined Marjorie and the boy would not get any of it and she said she wanted me to tell her what to do and I said I didn't want to do that. I didn't want to get mixed up and lose it or anybody get it from her. I said if she wanted to do that, she had better go and see John Ewing and have the information come outside the family.'

"Q. 'Do you know whether she did do that?'

"A. 'I think she did.'"

At a later date the transfers were made. Peter was asked what property Mrs. Keyes had when she died and the witness stated he did not know. He was examined further as follows:

"Q. 'She had given all to you and Tink?'

"A. 'Yes.'

"Q. 'So far as you would know that is so?'

"A. 'Yes.'

"Q. 'And she did that so that Charley would not get it and Marjorie might get it from Charley? That is the reason she gave it to you?'

"A. 'Yes, that is the reason she gave it to me.'"

Walter Hudson testified as follows with reference to the reasons for the transfers:

"Q. 'What I want to get at—you heard your brother Pete tell about dividing the money at the bank—was there any other gift besides that?'

"A. 'I would say there was.'

"Q. 'Did she ever tell you why she was giving money away?'

"A. 'Said she wanted us to have it.'

"Q. 'Did she say she thought the family should have it?'

"A. 'Yes.'

"Q. 'She thought the Hudson family should have it and not Charley and his children?'

"A. 'That is the way I remember.'

"Q. 'And you did bring the deed, Exhibit 1, and record it on the 6th of February of this year, 1948?'

"A. 'I am not sure of the date—6th of February, I think.'

"Q. '6th day of February; the recorder's record is correct?'

"A 'I think it is.'"

As to the reason for not recording the deed sooner, Walter testified as follows:

"Q. 'You didn't record it until after Lou died?'

"A. 'No.'

"Q. 'Why did you keep it off the records?'

"A. 'The only reason was I figured it would cause trouble around home there. I didn't do it for that reason.'

"Q. 'You mean up around her home?'

"A. 'Yes.'

"Q. 'If Charley knew about it that would cause trouble?'

"A. 'Yes.' "

Peter Hudson testified that he knew Mr. Keyes would have an interest in Mrs. Keyes' property when she died but added, "I think generally so but I think she could fix it so as to prevent it." Peter stated further that in his opinion Lou made a mistake when she married and "I worked like thunder in the hot summer time and laid by a little money and Lou worked and we made it together and I think it ought to stay together as long as we live and after that if they can get it all right." At the trial of the case both defendants testified that the property was transferred to them in exchange for their promise to take care of their sister for the rest of her life. Walter was asked why the property which came to Mrs. Keyes after December 1945 was transferred to him and he answered that that, too, was given to him on condition that he would support Mrs. Keyes for the remainder of her life. Note his evidence.

"Q. 'Was there any agreement for the $7,892.32 that came out of Ada's estate?'

"A. 'Yes.'

"Q. 'What was that agreement?'

"A. 'When she got more money she turned that to me with the same statement. She said, "Now, I want you to look after me and take care of me," and I agreed to that, of course.'

"Q. 'She asked you to do what you had already agreed to do two times before?'

"A. 'Yes, sir.'

"Q. 'When you got the rest of the money out of O. B.'s estate, $377.67 and $113.34 I believe it was, was there any agreement had as to that?'

"A 'Same as always. Practically the same agreement whenever she turned me any money.' "

So, the defendants finally contended that there were a half dozen agreements on their part to support their sister in return for the property received.

Viewing the case in the light of the evidence and of the actions of the parties subsequent to the transfers leads us to the conclusion that the sole purpose, as well as the idea which caused the transfers to be made, was to prevent any of the property of Mrs. Keyes from going to her husband or to the Keyes family. After the transfers were made, Walter continued, as he had for a number of years, to transact all the Hudson business and to deposit the cash in his own name. The principal support of Mrs. Keyes continued to come from the same source, that is, the pension received by Keyes. The only change came when Mrs. Keyes became very ill and required the attention

of an attendant, then Walter did pay the attendants' salaries and also paid a number of other bills. This, however, was consistent with what had always been the understanding of the parties. As Walter stated in his evidence, he deposited all money in his own name and "Well, I told the members of the family that I had it there and any money that they wanted, it was there and they could have it." Prior to the transfers of the property, Mrs. Keyes' cash, coming from and through the Hudsons, was subject to being checked against by Walter and not by Mrs. Keyes. The evidence further showed that the only time Mrs. Keyes needed financial assistance was during her last illness. Before going to the question of law presented here, we wish to quote from another witness of the defendants, apparently a disinterested and an intelligent witness. He had been a school teacher, a superintendent of schools, and a professor of Latin. His name was J. W. S. Dillon. He testified that he had known the Hudson family for fifty years or more. Note his evidence.

"Q. 'Now, I am asking you now between 1945 and the time of her death, did you ever hear her make any statement about what she had done with her property?'

"A. 'I did.'

"Q. 'Between 1945 and 1948 what had you heard Mrs. Keyes say about what she had done, if anything, with her property?'

"A. 'I heard her say that she had transferred her property to her brothers.'

"Q. 'Did she say anything else pertaining to it?'

"A. 'Yes; she did.'

"Q. 'What did she say?'

"A. 'She said, due to the fact that Mr. Keyes had gotten to the point where we do not feel that he is capable of knowing what he is doing about his own property,—'

"Q. 'Did she say anything else about that?'

"A. 'Yes.'

"Q. 'What else did she say?'

"A. 'Now, let me see? The question just before this, I was answering that she said she was transferring it to her brothers? Did I say that?'

"Q. 'Yes, sir.'

"A. 'Well, she said, we think it is best—now, she discussed quite freely with Mrs. Dillon and myself. Mrs. Dillon was there. "We think it is best to get these things prepared," because she said—we were talking about her garden every now and then, what a fine gardener she was,—she was getting so she couldn't do very well in the garden, and that probably was an indication that she was not in as good health as she had been and for that reason she thought best to prepare for the things that might come—rather and possibly anticipatedly.'

"Q. 'Did she say anything about her brothers supporting her and taking care of her?'

"A. 'Yes.'

"Q. 'What did she say?'

"A. 'She said, "that the brothers will take charge of,"—now, I do not know whether I can give that exactly,—she said, "the brothers will take charge of the property," and in fact they had always had charge of the property anyway—'

"Q. 'Yes,—'

"A. 'That is so far as caring for it.' "

Note that this witness, even after a leading and suggestive question with reference to support for Mrs. Keyes, did not testify that anything was said about support but confined his answer to the statement that Mrs. Keyes said her brothers would take charge of the property. We hold that the transfers made by Mrs. Keyes were made for the purpose of keeping her property in the Hudson family and thereby preventing Keyes from getting any part of it. With that as the object to be accomplished, she consulted a lawyer. The personal property of Mrs. Keyes, such as cash and bonds, was then in the name of Walter and Ada. In an attempt to make a transfer that would be good as against the husband, the parties went through the formality of delivering the bonds to Mrs. Keyes and she in turn, in the presence of a banker and a lawyer, gave them to her brothers. Likewise with the cash, a check was drawn and signed by Walter and then the check was given to Mrs. Keyes; she in turn delivered it to the defendants. The attorney stated in his evidence that the banker was called solely for the purpose of being a witness. In fact the lawyer testified that the parties realized a lawsuit was in the making. The deed recited a consideration of $1.00. It is evident no actual consideration for the transfers was contemplated. The deed executed later was kept from the record so as to keep the transaction a secret. One witness stated she heard Mrs. Keyes state in the presence of her husband that the transfers were made. The time of this conversation was not made clear nor that Mr. Keyes heard the statement. Also, the statement could have been made after Keyes was under guardianship. Both defendants admitted the transfers were made without the knowledge of Keyes. We are also convinced that the transfers were made in anticipation of death, as defendants' witness Dillon testified Mrs. Keyes told the witness her health was not as good as it "had been and for that reason she thought best to prepare for the things that might come . . ." Mrs. Keyes was then seventy-nine years of age.

It is the duty of this court to review de novo cases of this nature. We defer to the trial court's finding where the evidence does not convince us that such findings are incorrect. When the evidence does so convince us then we must make our own finding of facts.

924

The law applicable to this case is not difficult. Many such cases have reached the appellate courts. In Headington v. Woodward, 214 S. W. 963, we find the facts and circumstances somewhat similar to those in the present case, the difference being that there the grantor retained a life interest. In the present case the grantor did not do so. However, the property was dealt with in the same manner after the transfer as it had been before. In reality the difference in the two cases is nil. In the Headington case this court in speaking of the duty of husband and wife in dealing with their property, stated: (214 S. W. l. c. 967)

"The marital relation involves the most unlimited trust and confidence. The conduct of each spouse enters into the life of the other with its gifts of comfort or burdens of misery. Others may deal at arm's length, but they deal upon the standpoint of unity. The law imposes upon them no duty of suspicion or distrust, but they may hang their faith upon the mutual honesty which the nature of the relation necessarily implies. To safeguard their unity of interest is the object of the laws we are now considering. It was to destroy this unity that the conveyances in issue were made. The lack of courage to submit a matter involving mutual interest to mutual consideration is an index to the state of mind of the grantor to which the maxim that secrecy is a badge of fraud has peculiar application. That the transaction calls upon equity for correction has been firmly established by the decisions of this court from which we have already quoted."

The language is applicable to the case at hand. It would serve no useful purpose to review the law at length. It was reviewed in the case quoted from supra. More recently in the cases of Merz v. Tower Grove Bank and Trust Co., 344 Mo. 1150, 130 S. W. (2d) 611, and Noe v. Noe, No. 41,320, 359 Mo. 867, 224 S. W. (2d) 77, submitted at this term, but wherein we find an entirely different set of facts, the matter before us was fully reviewed. See also U. of Mo. Bulletin, Law Series 17-24, 19, p. 46; Scott v. Scott, 324 Mo. 1055, 26 S. W. (2d) 598; Crecelius v. Horst, 89 Mo. 356, 14 S. W. 510.

It follows that the judgment of the trial court must be reversed and the cause remanded ▆▆ with directions to enter a judgment for the plaintiffs. It is so ordered. *Bohling* and *Barrett*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.