**Patricia A. NELSON, Respondent,**

**v.**

**Vivian L. NELSON, a/k/a Vivian L. Scheibeler, Appellant,**

**and**

**Columbia Union National Bank, a corporation.**

**No. KCD 26401.**

Missouri Court of Appeals, Kansas City District.

July 1, 1974.

Motion for Rehearing and/or Transfer Denied Aug. 5, 1974.

Application to Transfer Denied Sept. 9, 1974.

William J. Hill, Kansas City, for appellant.

Edward F. Aylward, Kansas City, for respondent.

Before DIXON, C. J., and SHANGLER and WASSERSTROM, JJ.

WASSERSTROM, Judge.

A widow sues here to reach funds deposited in a bank account in joint names of her deceased husband and his sister. Plaintiff's theory is that the account in question was established and the funds deposited were transferred in fraud of her marital rights. The underlying facts are essentially undisputed, the issue being what inferences and legal conclusions are to be drawn therefrom.

Plaintiff and her deceased husband, Jack Clifford Nelson (called "Cliff"), were married on September 19, 1964, on which date she was 24 years of age and he was 49. At the time of the marriage she had one child, 9 months of age. She brought no funds to the marriage. On the other hand, Cliff was Vice President and Sales Manager of Vess Cola Bottling Company and had a modest accumulation of assets.

Substantially concurrent with the marriage, Cliff purchased a small home with a

downpayment of $5,000, which he put in joint names with plaintiff. He had additional assets at this time consisting of $7,000 in life insurance, on which the defendant sister Vivian was named as beneficiary, and an account with Blue Ridge Bank, which was in the joint names of Cliff and Vivian. Cliff apparently had some additional assets in his sole name, but no itemization or value of these additional assets appears in the record.

On January 11, 1966, Cliff opened the joint bank account here in question in the Columbia National Bank of Kansas City, Missouri. The opening deposit was $9,-112.45, of which $4,887.39 came from an account in Central Bank which had theretofore been in Cliff's sole name. Cliff never told plaintiff anything about this new account; but he did talk about it to a friend, to whom he gave as one reason for changing banks that he preferred the practice of Columbia National Bank of not disclosing information with respect to customers' deposits with the bank.

Relatively small withdrawals were made from time to time by Cliff from this joint account and several additional deposits were made. The most significant of these additional deposits was $4,000 in February of 1967, $4,000 on January 11, 1968, and $2,000 on March 25, 1969. Because of the withdrawals and deposits, there was some fluctuation in the balance kept in the account, but the balance increased overall until the final balance of $16,900 at the time of death.

A daughter was born to plaintiff and Cliff on September 3, 1968, and during that year plaintiff began requesting that she be accorded a greater participation in the family financial affairs. No doubt in response to those importunings and also because of the birth of the daughter, Cliff did make some changes in assets and handling of accounts. One action was to change the beneficiary on the $7,000 of life insurance from Vivian to plaintiff. Another change was the transfer of the ac-

count at Blue Ridge Bank from the names of Cliff and Vivian to the joint names of Cliff and plaintiff, and plaintiff thereafter very largely took charge of that account.

Cliff died from a heart attack on April 15, 1970. There was no period of disability prior to that death, and he had led a vigorous active life. There was evidence, however, that for some years prior to his death he had worked long hours; that he had become concerned about business affairs and that he had become nervous and excitable; that he had submitted himself to a number of physical examinations and electrocardiograms during the period 1966 to 1968; and that he stated to his wife that he thought he would die young and would not be around to see his children grow up.

Immediately following Cliff's death, plaintiff found herself with title to the house, $7,000 insurance proceeds, $6,000 in the Blue Ridge Bank and miscellaneous personal property of approximately $2,000. She discovered for the first time that Vivian was the surviving joint tenant of the Columbia National account. Plaintiff then approached Vivian with a suggestion that Vivian transfer $5,000 to each of the children and that Vivian keep the balance, but Vivian declined to go along with that suggestion. This suit followed.

Columbia National Bank paid into the registry of the court $17,762.70, which was the full principal amount of the account together with accrued interest. After receiving evidence, the trial court entered judgment for the plaintiff "as trustee" and ordered that the funds in the registry of the court be turned over to the administrator of the estate of Jack C. Nelson for the determination by the Probate Court of the amount of her marital rights. Vivian appeals from that judgment, assigning the following as error: 1) that plaintiff did not prove an intent and purpose by Cliff to defraud plaintiff of her marital rights; 2) that the trial court made improper computations in determining that the amount re-

ceived by plaintiff was so disproportionate as to give rise to an inference of intent to defraud; 3) that plaintiff failed to prove that the account in question was established in contemplation of imminent death; 4) that the trial court should have required answer to Interrogatory No. 18.

These points can be reduced to two by considering the interrelated Points 1, 2 and 3 together.

## I.

This case is controlled by § 474.150 (all statutory references herein being to RSMo 1969, V.A.M.S.), which provides as follows:

"1. Any gift made by a person, whether dying testate or intestate, in fraud of the marital rights of his surviving spouse to share in his estate, shall, at the election of the surviving spouse, be treated as a testamentary disposition and may be recovered from the donee and persons taking from him without adequate consideration and applied to the payment of the spouse's share, as in case of his election to take against the will."

The important portion of this statute for present purposes is the phrase "in fraud of the marital rights." This statutory phrase was intended to adopt the meaning of that term as it existed at common law. Reinheimer v. Rhedans, 327 S.W.2d 823 (Mo. 1959). Therefore, to see whether or not the transfer in this case was in fraud of plaintiff's marital rights, we must look at the extensive body of cases which developed under the common law of this state.

## A.

The common law of this state has long been that a spouse may not give away his property without consideration with the intent and purpose of defeating the marital rights of the other spouse. A leading case declaring this rule prior to the adoption of our present statute is Potter v. Winter, 280 S.W.2d 27 (Mo.1955). The law on this subject was thoroughly reviewed and readopted after enactment of the new 1955 statute in Edgar v. Fitzpatrick, 369 S.W.2d 592 (Mo.App.1963), modified on other grounds, 377 S.W.2d 314 (Mo. banc 1964). Under the common law, the burden of proving the prohibited intent and purpose to defraud was upon the surviving spouse. Dillard v. Dillard, 266 S.W.2d 561, 563 (Mo.1954); Sebree v. Rosen, 349 S.W.2d 865, 872 (Mo.1961). Although the present statute changes this burden of proof with respect to transfers of realty, the classical rule on burden of proof remains unaffected respecting personalty. Lowe, Transfers In Fraud of Marital Rights, 26 Mo.L.Rev. 1, l.c. 23 (1961). The trial court found that plaintiff here successfully sustained her burden of proof, and a review of all the evidence leads to the conclusion that the trial court's findings are justified.

Various elements have been recognized by the courts as indicative of a fraudulent intent to defraud the spouse. Lack of consideration for the transfer is one highly material element. Reinheimer v. Rhedans, supra. This element is unquestionably true here, since Vivian concededly furnished no part of the funds which made up the closing balance in the Columbia National account.

Another element which has been given substantial consideration by the cases is the retention of control by the transferor-spouse over the asset in question. Here, Cliff at all times retained full and complete control of the Columbia National account to the exclusion of Vivian and everyone else. He did in fact withdraw and add funds as he saw fit just the same as if the account had stayed in his sole name. Although a transfer by way of joint account is unquestionably valid in the absence of fraud, undue influence, mental incapacity or mistake [In re Estate of LaGarce, 487 S.W.2d 493, 501 (Mo.banc 1972)], nevertheless, the intrinsic nature of

this type of joint survivorship ownership is quasi testamentary, and that fact has been treated as a substantial factor for consideration concerning the intention of the transferor-spouse, with transfers of this general nature frequently being referred to as only "illusory." Edgar v. Fitzpatrick, supra; Tucker v. Tucker, 29 Mo. 350 (1860); Lowe, Transfers In Fraud of Marital Rights, 26 Mo.L.Rev. 1, 1.c. 14.

Still another factor uniformly considered by the courts is whether the amount of the transfer is disproportionate compared to the value of the transferor-spouse's total estate. Edgar v. Fitzpatrick, supra, and cases there cited. Under this important criterion, it becomes necessary to examine the whole of Cliff's estate at the time he established the Columbia National joint bank account in January, 1966. On that date, the only item with respect to which plaintiff had any title interest was the home, in which the initial equity only two years before was $5,000 and the total purchase price was only $10,500. Everything else, with only the most minor exceptions, stood in the joint names of Cliff and Vivian. As a result, Vivian stood to receive $7,000 in life insurance of which she was the named beneficiary, the $9,100 in the Columbia National Bank account, and some unspecified amount then on deposit in a joint account at Blue Ridge Bank. This contrasts with the much smaller sum of between $5,000 and $10,500, by way of equity in the home, which is the only thing which would have gone to plaintiff under the property arrangements as they existed in January, 1966, immediately after the establishment of the Columbia National joint bank account. Most obviously this was a grossly disproportionate provision for the wife and small child who then constituted the natural objects of Cliff's bounty.[1]

Also of great significance in determining the intent and purpose motivating the transfer is the factor of whether the transferor-spouse made the transfer openly and with frank disclosure, or whether on the other hand the transfer was made surreptitiously and without the candor which should obtain between husband and wife. Cliff's conduct here most certainly cannot be characterized as open and frank. He gave to one of his friends as a reason for placing this account with Columbia National Bank that the bank had the practice of refusing to disclose information about deposits, and under all the circumstances of this case the inference is permissible that the confidentiality which Cliff sought was against inquiry by plaintiff, among others. This inference is buttressed by the direction given by Cliff to the bank that all communications concerning the account were to be sent to him at his office, rather than to the home. Moreover, the bankbook was regularly kept by Cliff in his desk at the office, and it was only twice in the course of four years that the bankbook inadvertently came into the house where plaintiff could stumble upon it. Even then the passbook contained only Cliff's name, thus calculated to mislead plaintiff or anyone else who saw it concerning the true registration of the account. Still further, Cliff filed no income tax returns for several years prior to his death, and upon inquiry as to this by plaintiff, he replied cryptically that "he would take care of it." From this it can be inferred that Cliff was purposely refraining from preparing returns which would normally have to be signed by the wife and which would contain a report of income on this account which might excite her curiosity and questioning.

Still further to be considered is the reaction by Vivian when first approached by

---

1. Vivian contends that under Wahl v. Wahl, 357 Mo. 89, 206 S.W.2d 334 (1947), she should be considered as the natural object of Cliff's bounty. However, under the circumstances here, Cliff's wife and child must be considered as being the primary natural objects of his bounty. Norris v. Bristow, 358 Mo. 1177, 219 S.W.2d 367 (1949).

plaintiff about this joint account after Cliff's death. When plaintiff told her at that time that she had just found out about the joint account, Vivian professed surprise and according to plaintiff's testimony "she was very shocked about it to me and said she didn't know anything about it." This was in the face of the fact that Vivian had signed the signature card on the joint account in 1966 and therefore necessarily knew about the account. This discrepancy, together with the fact that Vivian was in court but failed to testify, constitutes substantial basis for an inference that there was an agreed conduct of concealment on the part of Cliff and Vivian to keep plaintiff in ignorance of the true facts.

 If this course of conduct over a period of four years does not rise to the level of an effective campaign of concealment, it at least qualifies as a lack of candor in violation of marital duty. The nature of this duty has been forcefully stated by the Missouri Supreme Court in Hastings v. Hudson, 359 Mo. 912, 224 S.W.2d 945, 1.c. 950, quoting from the earlier case of Headington v. Woodward, 214 S.W. 963, 967 (Mo.1919):

> "The marital relation involves the most unlimited trust and confidence. The conduct of each spouse enters into the life of the other with its gifts of comfort or burdens of misery. Others may deal at arm's length, but they deal upon the standpoint of unity. The law imposes upon them no duty of suspicion or distrust, but they may hang their faith upon the mutual honesty which the nature of the relation necessarily implies. To safeguard their unity of interest is the object of the laws we are now considering. It was to destroy this unity that the conveyances in issue were made. The lack of courage to submit a matter involving mutual interest to mutual consideration is an index to the state of mind of the grantor to which the maxim that secrecy is a badge of fraud has peculiar application. That the transaction calls upon equity for correction has been firmly established by the decisions of this court from which we have already quoted."

It is to be noted that in Potter v. Winter, 280 S.W.2d 27 (Mo.1955), the court stressed the absence of secrecy in concluding that there was no fraud, saying, "[h]ere we have no surreptitious or furtive execution of a conveyance." See also Edgar v. Fitzpatrick, 369 S.W.2d 592 (Mo. App.1963).

### B.

 Vivian struggles to escape the conclusion of fraud flowing from the foregoing analysis, emphasizing particularly the amount of property received by plaintiff at the time of death and she argues that the amount so received is substantially equal to what plaintiff would have received had Cliff used other planning techniques in order to reduce his wife's inheritance to the barest minimum. This argument fails of persuasion. First and most important, Vivian chooses the incorrect date upon which to make an analysis of assets in order to see whether the provision for the wife was disproportionately small. The appropriate date for this purpose is not the date of death, which Vivian attempts to use, but rather the dates upon which the transfers were made. The inquiry is whether the transfers were fraudulent, and it necessarily follows that it is the circumstances existing at those times which must be the focus of attention. As hereinabove already shown, on January 11, 1966, when the Columbia National joint account was established, and even more so on the two subsequent dates when additional deposits of $4,000 each were made to the joint account, Cliff had placed plaintiff's name on very little property, with the result that the interest which would come to her on Cliff's death was without question disproportionately small.

Vivian's argument, to have any validity at all, would have to rest on some theory

that Cliff retained control of the Columbia National joint account at all times until his death, that it was therefore within his power to rearrange his affairs as he saw fit during his continued lifetime, and that the change in his attitude toward his wife as reflected by his transfer of additional interests to her in 1968 served to detoxify the situation which had existed previously. Whatever merit there might be in such an approach under other circumstances, it carries no persuasion in the present situation. An important vice in Cliff's manner of dealing was the element of secrecy, and this secrecy continued unabated at all times from the creation of the Columbia National joint account until the very date of his death; and in fact it was continued thereafter by Vivian's disclaimer of knowledge of the account despite the fact that she had signed the original account card.

Furthermore, it would be ironic to conclude that Cliff had repented of his original niggardliness in providing for his wife and children, and then inconsistently assume that he would nevertheless utilize every device now conceived by ingenious counsel by which he could have legally minimized their share of his estate. The change of heart assumed in the first part of the argument would demand an attribution of a greater spirit of generosity and the shouldering of greater responsibility than this toward the natural objects of his bounty.

### C.

Vivian complains of the computations used by the trial court to show that the plaintiff widow would receive less if the joint ownership of the Columbia National account were given effect than if all joint tenancies between Cliff and either his wife or sister were completely disregarded. The memorandum opinion of the trial court in this regard did employ the approach that in considering the property jointly held by Cliff and plaintiff, one-half of that jointly held property represented the wife's own property and therefore was not taken by the wife simply by survivorship. The result of this computation would reduce the amount received by plaintiff by reason of Cliff's death from $25,000 to $16,000, which would be a sum less than that which would go to the defendant sister by way of the Columbia National joint account. The trial court used this calculation to show that giving effect to that joint title would result in a disproprotionately small participation in total assets by plaintiff and her children.

■ Vivian contends that if this approach be taken with respect to the amount received by plaintiff, then Vivian's share of $16,900 should also be "discounted" by one-half, on the theory that this was already her rightful share; so that her true amount received by survivorship would be reduced from $16,900 to $8,450. Consideration of this point is not mandatory, because the trial court's computations are not essential to disposition of this case, which we place on the other grounds hereinabove discussed. Nevertheless, the approach taken and the computations relied upon by the trial court are justified.

■ The underlying mistake in Vivian's argument is the contention that both she and plaintiff are in exactly the same situation of having received transfers inter vivos, all in joint names, and with neither of them having furnished any consideration for any of the transfers. Overlooking other important considerations (such as the home having been transferred into an estate by the entireties which thereafter could no longer be severed by the unilateral action of Cliff alone), there exists a very vital difference between the situation of plaintiff as contrasted to that of Vivian. Vivian concededly gave no consideration of any kind for the transfers made to her by Cliff; but she is plainly wrong in arguing that plaintiff likewise gave no consideration. If nothing else, the entry into marriage has always been treated as substantial consideration and that act alone by plaintiff is supporting consideration for the

transfer to her of an interest by the entirety in the home which was purchased substantially concurrently with the marriage. See L . . . v. L . . ., 497 S.W.2d 840, 842 (Mo.App.1973). Thereafter plaintiff continued to render services to her husband and children as a faithful wife and mother. It is not necessary to cite the recent studies by a number of economists undertaking to reduce to a dollar amount the sheer economic value of such services —we all know without precise computation that these services are very valuable, indeed beyond any mere dollar amount. Most certainly it cannot be considered that a transfer from a husband to his wife, at least for purposes of the present consideration, was without consideration.

### D.

Vivian also insists that plaintiff has failed to prove that Cliff transferred the funds in question in contemplation of imminent death. Plaintiff did submit some evidence to the effect that Cliff was conscious of impending death for some years prior to his actual death, but the trial court specifically found that "[t]he facts in this case do not support such a finding [of transfer in contemplation of imminent death]." That conclusion is in accord with the record as a whole and must be accepted.

 However, Vivian is mistaken in the contention that "contemplation of imminent death" is an essential element of plaintiff's cause. Unquestionably that is one factor for consideration, but a showing of contemplation of imminent death by the transferor-spouse is not an indispensable requirement. As held in Resch v. Rowland, 257 S.W.2d 621, l.c. 626 (Mo.1953): "A conveyance does not necessarily have to be made in contemplation of death if it in fact be made to defraud the wife of her dower." See Lowe, Transfers In Fraud of Marital Rights, 26 Mo.L.Rev. 1, l.c. 17–19 (1961).

### E.

Rule 73.01(d), V.A.M.R. requires that judgment in cases tried without a jury not be disturbed on appeal unless clearly erroneous. Far from being clearly erroneous, the memorandum decision written by the trial court in this case for the benefit of counsel and for the assistance of this court demonstrates an able apprehension of the applicable legal principles and a thoughtful application of those rules to the factual situation presented.

### II.

As part of the discovery procedure before trial, Vivian submitted extensive interrogatories. After a series of questions probing various assets owned by Cliff and transferred to plaintiff and her children, Vivian then submitted the following "catch-all" interrogatory:

> "18. Excluding any property or assets which you have listed in answer to any prior Interrogatory, please furnish an itemized list of all monies, properties or other assets of any kind which you received, or your children may have received, as a direct result of the death of Jack C. Nelson, and state the separate approximate fair market value of each such items so received."

Plaintiff objected to that interrogatory and the objection was sustained.

 This Interrogatory No. 18 was not essential since the question of property and transfers had been already adequately covered by other interrogatories. Moreover, Interrogatory No. 18 was directed to property held at the date of Cliff's death and for reasons already stated in this opinion, that was not the crucial date of inquiry. For these reasons, there was no reversible error in not requiring answer to this interrogatory.

Parenthetically, counsel for plaintiff was asked by the court during oral argument whether there was in fact any property or

asset received by the plaintiff or her children which was not reflected in answers to other interrogatories. Plaintiff's counsel answered under his responsibility as an officer of this court that there was no such property or assets. Accordingly, we are satisfied as a practical matter that Vivian has not been deprived of any information and that no prejudice has accrued to her by reason of the ruling concerning Interrogatory No. 18.

### III.

The judgment in this case will be affirmed. However, a careful study of Section 474.150 as interpreted by Edgar v. Fitzpatrick, 377 S.W.2d 314, 1.c. 316 (Mo. banc 1964), compels the conclusion that the provision in the decree entered in the circuit court appointing plaintiff as trustee of the proceeds of the Columbia National joint account is unnecessary and inappropriate. The decree is therefore amended, under the authority of Rule 84.14, to delete that provision.

In view of the wide disagreement apparent between the parties with respect to the interpretation and interrelationship of the statutes which will govern distribution in the Probate Court, an expression in that regard should be helpful. By the terms of § 474.150, plaintiff is to receive a spouse's share as in the case of an election to take against a will. That brings into play the following statutory sections with the following results.

The widow will first of all be entitled to all exempt property under § 474.250. Then she will be entitled to receive a reasonable allowance for the maintenance during the period of one year after the death of Jack C. Nelson, for herself and her two children, under § 474.260. Next, she will be entitled to one-half of the remainder (which will no doubt be less than the $7,500 maximum limit) as her homestead allowance under § 474.290; and since this doubtlessly will exceed the one-third interest due her by way of inheritance under §

474.160, no additional distribution will become due to her under the latter section. The balance of the probate estate, after payment of claims and expenses of administration, will be payable to Vivian.

The judgment is affirmed as modified.

All concur.