Arzetta **HATHMAN**, Executrix of the Estate of J. E. Hathman, and Arzetta Hathman, Individually, Appellants,

v.

T. P. **WATERS**, Jr. and Carolyn Waters, Respondents.

No. KCD 29890.

Missouri Court of Appeals, Western District.

July 31, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 4, 1979.

Application to Transfer Denied Oct. 10, 1979.

Howard F. Sachs, Jerome T. Wolf, Kansas City, for appellants; Spencer, Fane, Britt & Browne, Kansas City, of counsel.

John David Collins, Collins & Grimm, Macon, for respondents.

Before SHANGLER, P. J., WASSERSTROM, C. J., and CLARK, J.

WASSERSTROM, Chief Judge.

J. E. Hathman and his wife Arzetta filed this suit to set aside a contract under which defendant T. P. Waters, Jr. is entitled to acquire certain capital stock of J. E. Hathman, Incorporated (hereinafter "the Corporation"). After completion of the trial and pending decision by the trial court, Hathman died and Arzetta, as executrix of his estate, was substituted in his stead. Thereafter the trial court entered judgment for defendants. Arzetta now appeals in her own right and as executrix.

Shortly after World War I, Hathman started in the general contracting business

as a sole proprietor under the name J. E. Hathman Contracting. In December, 1947, he married Arzetta, who at the time of marriage was possessed of a residence to which she held title. In March, 1948, she sold that residence for about $13,000, $12,298.60 of which she deposited in a joint account standing in the names of the two spouses. Shortly thereafter, Hathman asked her if she would care if he drew $10,000 of that money to use in his business, to which she responded, "I do not object." The evidence shows that a check for $10,000 was drawn on April 1, 1948, by Hathman to J. E. Hathman Construction Co. from an account entitled "J. E. Hathman—Contractor Personal Account." Hathman and Arzetta both testified that this $10,000 which so went into the contracting business came out of the proceeds of the house sale by Arzetta, and Hathman gave Arzetta the $10,000 cancelled check for her to keep as proof that she had given him the money to use.

In June, 1948, Hathman, together with John W. Adams, D. W. Price, Ben W. Cassity and Lee Phillips, Jr., organized a corporation under the name J. E. Hathman Construction Company, with a capitalization of $10,000, of which Hathman subscribed to 48½%. That corporation continued until the end of 1949, at which time the corporation was dissolved and the net assets distributed.

Thereupon, Hathman resumed operation as a sole proprietorship. During this period of sole proprietorship he withdrew money as he desired for his own personal and family purposes as he saw fit. This operation continued until September 15, 1952, when the present Corporation was organized. The new Corporation was capitalized at $27,100, and Hathman received 51% of the stock. The other stockholders were Cassity and Phillips, who owned respectively 9½% and 39½%. The Corporation continued with this management until the fall of 1953, when Phillips left the business. At that time Hathman and Cassity approached Waters, who was a graduate engineer working for another concern in St. Louis. Waters agreed to enter the employment of the Corporation under an arrangement which included his buying 35% of the Corporation stock. At that time Hathman told Waters and Cassity, "Another five or six years I'm going to turn it over to you boys. I want to give you a good start."

In 1954 and 1955, the three stockholders entered into agreements under which each agreed to sell his respective stock upon death to the Corporation. The agreements by Waters and Cassity were funded by life insurance policies on the life of each of those men for $12,500, and the agreement by Hathman was funded by a life insurance policy in the amount of $25,000.

As the years went along, the Corporation prospered, Hathman did nothing about retiring, and the other two officers became concerned about being able financially to purchase Hathman's stock in the event of his death. Therefore, in 1963, Waters talked to Hathman about permitting him and Cassity to begin purchasing some of his stock immediately. Hathman rejected this suggestion for the reason that he wanted to retain control of the Corporation during his lifetime.

Waters then went to the Corporation attorney, Ed Brown, with the request that Brown prepare an agreement under which Waters and Cassity could acquire some of Hathman's stock and concurrently deliver to Hathman their proxies to vote the stock so purchased. After Brown prepared such an agreement, Waters presented it to Hathman, who declined to consider that approach, but stated that "I'll work out something you and Ben can live with."

Following that conversation, Hathman went to Attorney Brown in the early part of 1964, and asked him to draw up papers under which he could keep 51% of the stock during his lifetime, Waters and Cassity would get the Corporation upon his death (except for 15% of the stock which was to go to a nephew, Dean Hathman), and Arzetta would receive $1,000 a month out of the Corporation profits until her death. Brown turned over the assignment of drafting the requested documents to his associ-

ate, Willbrand, who reported legal objections to following the precise mechanics outlined by Hathman. Willbrand suggested instead that the Corporation agreed to purchase Hathman's stock at par value plus a promise to pay Arzetta the annuity of $1,000 a month out of profits, that the Corporation agreed to resell that stock to Waters, Cassity and Dean Hathman in the agreed proportions at par value, and that Hathman by will bequeath money to Waters, Cassity and Dean Hathman to cover their respective stock purchase obligations. Brown discussed this alternative plan with Hathman, who agreed thereto.

Willbrand then proceeded to draft the agreement along these lines and Brown presented the draft to Waters for his review sometime in the summer of 1964. Waters discussed the proposed agreement with Cassity, after which he suggested two modifications: (1) that Hathman be paid $1,000 a month in the event of his retirement; and (2) that there be a restriction on dividends, so that only salaries and bonuses sufficient to pay income taxes could be drawn out of the Corporation. Hathman indicated acceptance of these modifications, the agreement was redrafted, and the parties all met, together with Brown and the Corporation accountant, for a signing of the agreement.

Brown explained the terms of the agreement and the accountant discussed the tax ramifications. During the course of the meeting, Waters asked Hathman to tell Arzetta about the agreement, but Hathman replied "She's well provided for. The stock is mine and I don't want her to know about it." This statement by Hathman about his being sole owner of the stock was in accordance with information which Waters had also received from the attorney when he had inquired about the necessity of having Arzetta join in the agreement. After the explanations and the conversation mentioned, the agreement was signed as prepared.

This arrangement between the stockholders remained unchanged until 1968, when Cassity sold out and left the Corporation.

Waters then brought up the subject of changing the 1964 agreement because of Cassity's no longer being in the Corporation, and Waters expressed the thought that he should be entitled to the stock which was to have gone to Cassity. Hathman agreed. Waters then approached the attorneys to have a new agreement prepared. The attorneys did prepare a new stockholders' agreement and a new will, and they met with Hathman to go over these documents with him. A new stock agreement was signed at the Corporation office in January, 1969, and the new will was executed by Hathman on July 31, 1969. The 1969 agreement was basically the same as the 1964 agreement, except that there was no provision for the Corporation to pay par value of the stock to the Hathman estate and there was no provision for resale of stock by the Corporation.

Subsequent to the execution of the 1969 agreement and will, Hathman executed still another change to his will by a 1971 codicil. At that time, he again asked Brown to keep the executed copy of the will for the reason that he did not want Arzetta to know about the 1964 or 1969 agreements. Brown urged Hathman to make a disclosure about those arrangements to Arzetta, but Hathman replied that "it was his stock, his company; he'd do with it what he pleased."

In 1973 Arzetta did learn about the 1969 agreement and made sharp protest. Hathman's initial reaction was to tell Arzetta that if she was displeased that she should get her own lawyer and draw a new agreement. Eventually, however, Hathman came around to Arzetta's position and joined with her in the present suit to cancel the 1969 agreement.

On this appeal, Arzetta argues that the trial court erred in sustaining the contract because: (1) Arzetta's joinder in the contract was necessary to its validity, in that she had an ownership interest in the stock of the Corporation owned by Hathman by way of a resulting trust through the operation of statutory Section 451.250 (all statutory references are to RSMo 1978, unless otherwise stated); (2) such joinder was nec-

essary because Arzetta had an ownership interest by way of resulting trust arising out of her joint ownership of the bank account out of which $10,000 was paid into the construction business; (3) the contract was void for lack of consideration and mutuality; (4) the contract was void because induced by fraudulent means; (5) the contract was void because it was purportedly executed by the Corporation at a time when its charter had been forfeited; and (6) the contract was voidable at the instance of Arzetta because it constituted a fraud on her marital rights.

## I

### THE CLAIMED RESULTING TRUST

The above points 1 and 2 can most profitably be discussed together inasmuch as both of them aim at establishing a resulting trust in favor of Arzetta to Hathman's stock, with the consequence of invalidity of the contract as to her because she never agreed to it. She claims a right not simply to a return of her original $10,000, but in addition she insists that she has a right to all of the augmentation which has accrued over all the intervening years by reason of the use of that $10,000. Waters, on the other hand, contends Arzetta made a gift of the $10,000 to her husband. Arzetta responds that there cannot be a gift because of the provisions of Section 451.250, and further because of an alleged legal presumption that the joint ownership character of the joint bank account followed the investment of that money by Hathman into his construction business.

█ Both of these alternative claims by Arzetta fail because the facts show that the transfer of the $10,000 in 1948 constituted a gift by her to her husband, and neither Section 451.250 nor the joint ownership of the joint bank account has the effect of transforming that gift into a resulting trust. Moreover, Arzetta has failed to carry her burden of proving a resulting trust in that she has failed to show the exact proportion which her $10,000 contribution had to the total value of Hathman's stock in the Corporation.

A. *The Effect of Section 451.250.* Section 451.250, first enacted in 1875, reads in pertinent part as follows:

"1. All real estate and any personal property . . . belonging to any woman at her marriage . . . shall . . . be and remain her separate property . . . . .

2. This section shall not affect the title of any husband *to* any personal property reduced to his possession with the express assent of his wife; provided, that said personal property shall not be deemed to have been reduced to possession by the husband by his use . . . but the same shall remain her separate property, unless by the terms of said assent, *in writing*, full authority shall have been given by the wife to the husband to sell, encumber or otherwise dispose of the same for his own use and benefit . . ." (emphasis added).

Arzetta argues that she never assented in writing to a gift of $10,000 to her husband, and that therefore when Hathman took that $10,000, which was the proceeds of a sale of the residence owned by her prior to the marriage, he took those funds as a trustee and that she is entitled to follow that trust fund into the construction company in which the $10,000 was invested.

█ That argument fails for two reasons. In the first place, Section 451.250 applies only to a situation in which the husband by his act takes the wife's property and reduces it to his possession; and it has no application where the transfer is made by act of the wife herself. *Ferguson v. Stokes,* 269 S.W.2d 655 (Mo.1954); *Murphy v. Wolfe,* 329 Mo. 545, 45 S.W.2d 1079 (banc 1932). In this case, Arzetta testified that she made the deposit of the proceeds of the sale of the house by her own act into a joint bank account. Therefore the gift transfer in question does not fall within Section 451.250.

█ Secondly, the requirement of a written consent contained in Section 451.250 has been eliminated by Section 451.290, the

forerunner of which was first enacted in 1889. This later statute provides that a married woman shall be deemed a femme sole. Controlling decisions of the Missouri Supreme Court en banc declare that this later section gives a married woman the right to make a parol gift of personal property to her husband despite the provisions of Section 451.250. *In re McMenamy's Guardianship*, 307 Mo. 98, 270 S.W. 662 (banc 1925); *Murphy v. Wolfe, supra.*

■ B. *The Effect of Joint Ownership of the Bank Account.* Arzetta contends that her $12,298.60 (proceeds of the house sale) were deposited in a joint bank account with rights of survivorship and that this joint ownership character follows the withdrawal of $10,000 of that fund by Hathman and the investment thereof in the construction business. Arzetta argues that this result must follow from the legal presumption that withdrawals by a husband from an account held jointly by the spouses presumptively becomes a resulting trust in favor of the wife. However, the presumption so relied on has been characterized as weak at best, and whether the withdrawal results in a gift or a trust depends upon intention as inferred from the particular facts of each case. *Ambruster v. Ambruster*, 326 Mo. 51, 31 S.W.2d 28 (1930); *Harrellson v. Barks*, 326 S.W.2d 351 (Mo.App.1959).

■ Here the presumption relied upon by Arzetta is clearly overcome by the many years of acquiescence by her in the assertion of ownership by her husband. She knew at the time her husband withdrew the $10,000 that he intended to use it in a business standing in his own name, and she expressly assented to that use. During the twenty-five years thereafter she made no claim of ownership in the construction business,[1] and this in the face of her testimony that she knew that her husband had an intention and some plan of giving stock to the young men involved in the business, particularly Waters. At the very least, there has been no proof by Arzetta that she

did not know and realize that her husband was asserting and exercising full rights of sole ownership in the construction business into which the $10,000 is claimed to have been invested. *Cooper v. Freer*, 385 S.W.2d 340 (Mo.App.1964). Looking at the whole record realistically, the inescapable conclusion is that she did know and acquiesce.

■ Under circumstances in which the wife has full knowledge of and acquiesces in the husband's appropriation of funds from a joint account, that withdrawal must be treated as a gift with full title vested in the husband. *Ambruster v. Ambruster, supra; Harrellson v. Barks, supra; Cooper v. Freer, supra.* That is particularly true where, as here, the withdrawals were to further the husband's business, the proceeds of which were intended to be and actually did inure to the great benefit of both parties. This case falls squarely within the following rule stated in *Harrellson v. Barks, supra* at l. c. 361:

"It would seem that the practical, and therefore better, rule to follow in regard to withdrawals from entirety accounts would be this: Where the withdrawals are partial and not obviously to obtain unfair ownership or advantage, and where the purpose of the withdrawal can reasonably be considered as one which could suit the wishes, purposes, and intention or consent of both the owners of the entirety account, and there is no apparent objection after the withdrawal is known, then the *presumption* should be that the withdrawal was by consent and agreement of the joint owners." (emphasis in the original).

■ C. *Failure to Prove an Exact Percentage of the Wife's Contribution to the Total Investment.* A resulting trust arises where one party pays all or a part of the consideration for the acquisition of property which is taken in the name of a second party, if the payor intended and expected to obtain an ownership interest in

---

**1.** As pointed out by the trial court in its Memorandum Opinion, Arzetta did not make such ownership claim until added by Second Amended Petition which was not presented until just days before trial.

that property. Restatement Trusts 2d, Section 440 et seq. However, the burden of establishing all the requirements of a resulting trust rests upon the payor and his showing must be by such cogent, clear, unequivocal and positive evidence as to banish doubt from the mind of the chancellor. *March v. Gerstenschlager,* 436 S.W.2d 6, 1. c. 8 (Mo.1969); *Clubine v. Frazer,* 346 Mo. 1, 139 S.W.2d 529 (1940); *Shelby v. Shelby,* 357 Mo. 557, 209 S.W.2d 896 (1948); *Ellis v. Williams,* 312 S.W.2d 97 (Mo.1958). Where the consideration furnished by the payor is less than the total consideration for the property acquired, then part of that burden is to show the exact proportion which his contribution bore to the total of the purchase price. Scott on Trusts Sec. 454 at p. 3374 (3d ed. 1967); Bogert, Trusts and Trustees Sec. 457 at p. 685 (2d rev. ed. 1977); *Ellis v. Williams, supra; Shelby v. Shelby, supra; Clubine v. Frazer, supra; Hinkle v. Hinkle,* 236 S.W. 30 (Mo.1921).

The burden last mentioned was not carried by Arzetta in this case. Although she did show the amount which she received for the sale of her house and which was deposited by her into the joint bank account, the record is silent as to how much money was already in that joint account prior to her deposit. Furthermore, the check for $10,000 which went into the construction business came not from the joint account "Mr. and Mrs. J. E. Hathman," but rather from an account entitled "J. E. Hathman—Contractor Personal Account," and there is no evidence as to whether or not the latter account was joint between the spouses or how much money was on deposit in that account on April 1, 1948, the date on which the $10,000 check was drawn. Still further, there is no evidence showing the net worth of the contracting business on April 1, 1948, so that there could be a calculation of what percentage the $10,000 contribution was to the total value of the business on that date.

Still further, the record shows that when the construction business was incorporated for the first time in 1948, the total capitalization was only $10,000, of which Hathman subscribed for only $4,850. There is no inkling in the record as to whether the sole proprietorship had dwindled to this amount, or if not, what happened to the excess of that net worth which was not invested in the corporation. Still further, there is no evidence as to what the net worth of the first corporation was when it was dissolved in December of 1949, nor the amount of the distribution received by Hathman from that corporation, nor how much of that distribution went into his successor sole proprietorship.[2] Nor is there evidence as to how much Hathman withdrew from this sole proprietorship for outside investments during the period January 1950 until September 1952, when the present Corporation was organized (the record does show that during that interim period Hathman did make at least one substantial withdrawal of approximately $27,000 to buy a valuable horse).

Thus it is totally impossible to arrive at any fixed percentage which Arzetta's $10,000 had to the value of the construction company at any particular time. This lack of proof becomes particularly significant when it is pointed out that by 1969 the Hathmans had accumulated extensive investments, outside the construction business, of which their real estate assets alone exceeded one million dollars. It is therefore impossible to say without the wildest kind of speculation whether any and if so how much of Arzetta's contribution and the increment thereon was represented by the value of Hathman's shares in the corporation in either 1952 or 1969.

■ The trial court found that there was no evidence that Arzetta's $10,000 was used for purposes of the Corporation. That finding is closely akin to the conclusion reached by this opinion that Arzetta has failed to show an exact percentage which

---

2. Hathman testified that all of the assets of the first corporation "went back into the next corporation" when the present Corporation was organized. That was patently impossible because: 1) some of the assets of the first corporation were distributed to other stockholders; and 2) Hathman's share of those assets went into the intervening sole proprietorship.

her contribution bore to the total value of the asset into which it went. In any event, the result reached by the trial court must be affirmed if it is correct upon any theory. See the many cases announcing this rule in Missouri Digest, Appeal and Error, ⊜854(2).

## II.

## ALLEGED LACK OF CONSIDERATION

Arzetta's third point argues that the 1969 agreement lacked consideration and mutuality of obligation in that payment for the stock would be made in the form of an annuity to Arzetta, payable only out of current profits, and that the showing of profits would depend upon the pleasure and will of Waters, who after Hathman's death would be in control of the Corporation. It is true that the contract provided that the $1,000 a month would be paid to Arzetta "out of current profit and not out of the capital of the Corporation." However the record shows that the Corporation had been a remarkably successful enterprise for many years and had earned net profits in excess of $12,000 each year for the seven years preceding the 1969 contract, ranging from a low of $59,386.33 to a high of $154,580.84 per year. Accordingly, there was little probability that the profits would be inadequate to pay the promised annuity.

As to the argument that Waters could control profits by increasing salaries and dividends, it should first be noted that the payment of a dividend would not reduce net profits and therefore could not provide any basis for depriving Arzetta of her annuity. With respect to possible increases in salaries, it should be noted that the 1969 contract contained a provision limiting the salary of each of Hathman and Waters and further provided that "[m]oneys other than salaries and bonuses referred to herein shall be retained by the Corporation and shall be the Corporation's money." Even if it could be thought that this contractual provision would no longer be binding after Hathman's death, still Arzetta would have the right to resort to court action in the event of any fraudulent action on the part of Waters to avoid payment of the promised annuity.

## III.

## ALLEGED FRAUD AND BREACH OF CONFIDENTIAL RELATIONSHIP

■ Under this point Arzetta argues that Hathman was fraudulently induced by Waters and Brown to part with valuable stock for an "illusory" consideration. In support of this contention, Arzetta argues that Hathman at the time of the 1969 agreement was 81 years of age, he had had two heart attacks and suffered from cataracts. She further argues that both Waters and Brown (particularly Brown) were in a confidential relationship to Hathman, and that the nature of the agreement was misrepresented by them and was not understood by Hathman when he executed the agreement.

A searching review of this record discloses no misrepresentations made by anyone to Hathman. Rather the evidence shows that the arrangements for disposition of his stock at his death were basically devised by Hathman himself and were reflected in the 1964 agreement. The 1969 agreement followed substantially the same format, except for those changes appropriately brought about by reason of Cassity's ceasing to be a participant in the Corporation. The evidence fully supports the findings of the trial court "that from the witnesses presented it is clear that plaintiff J. E. Hathman, regardless of prior health problems, was mentally alert in the years 1968–1969" and that "it is clear that the agreement of January, 1969, provided exactly what J. E. Hathman wanted; that is that T. P. Waters would ultimately own the company, but that his wife Arzetta Hathman would receive an income for life from the profits. The Court must reject the contention that attorney Brown did anything improper or that he in any way misled plaintiff J. E. Hathman." The findings by the trial court that there was no fraud or lack of understanding by Hathman is supported by substantial evidence and is not against

the weight of the evidence and therefore must be accepted under the doctrine of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).

■■■ As to the argument concerning "illusory" consideration, there can be no question but that $1,000 a month is more than a merely nominal amount. Whether or not that amount of annuity to a 74 year old woman constitutes a good bargain in exchange for Hathman's shares (which had a book value of approximately $350,000 in 1969) need not be determined. The law is well settled that a consideration, though small, is adequate to support a contract, and that inadequacy of consideration, in the absence of fraud, does not constitute any defense. This rests upon the policy of the law to let the parties weigh the benefits pro and con and to leave them free to make whatever contract between themselves that they please. *Brown v. Weare*, 348 Mo. 135, 152 S.W.2d 649 (1941); *Cox v. A. P. Green Fire Brick Co.*, 230 Mo.App. 774, 75 S.W.2d 621 (1934); *Glover v. Shirley*, 169 Mo.App. 637, 155 S.W. 878 (1913); *Forbs v. St. Louis, I. M. & S. Ry. Co.*, 107 Mo.App. 661, 82 S.W. 562 (1904).

Furthermore, if the adequacy of consideration were properly for determination, there would have to be taken into account not only the annuity to Arzetta, but also the retirement benefit to Hathman, and even more importantly the continuation by Waters of his services to the Corporation. It had long been in contemplation that Waters was to become the majority owner of the Corporation at Hathman's death, and just before the 1964 arrangement was consummated Waters had been discussing with Cassity the advisability of leaving the Corporation rather than to continue without some firm contractual arrangement with Hathman in this respect. There can be no doubt that the securing of Waters' continued service to the Corporation was the prime motivating reason for the 1964 contract, which was simply carried forward in slightly modified form by the 1969 contract. In view of the great financial success of the Corporation under Waters' leadership, that continuation of his services was valuable consideration indeed.

## IV.

### FORFEITURE OF THE CORPORATE CHARTER

■■■ On January 1, 1969, the Missouri Secretary of State declared the Corporation's charter forfeited for non-registration. Thereafter, on March 5, 1969, the forfeiture was rescinded by the Secretary of State and the charter reinstated. However, it was during the interval between those two events that the contract now under attack was executed on January 27, 1969. Arzetta argues that on the date of that execution, the Corporation had no legal existence and that therefore the contract was and continues to be void.

The law has long been to the contrary. *Barron G. Collier, Inc. v. American Cafeteria*, 215 Mo.App. 182, 256 S.W. 118 (1923). The rule stated in *Collier* was approved in *Leibson v. Henry*, 356 Mo. 953, 204 S.W.2d 310 (banc 1947) and was recognized in *Clark Estate Co. v. Gentry*, 362 Mo. 80, 240 S.W.2d 124 (1952).

■■■ Arzetta argues that a 1975 amendment to Section 351.540 makes statutory provision for the first time that all acts of a corporation between the date of a forfeiture and the date of the rescission of that forfeiture shall be confirmed and held to be the acts of the original corporation; and she contends that the result must be held to be otherwise with respect to the 1969 contract here in question which, of course, was executed prior to the 1975 statutory amendment. However, the effect of the 1975 amendment as it affects the validity of this contract was merely to codify the already existing case law in this state, as declared in *Collier, supra*. The 1975 amendment effected no change in that respect.

## V.

### THE ALLEGED FRAUD ON MARITAL RIGHTS

Arzetta contends finally that the 1969 agreement constituted a fraud on her rights

under Section 474.150. Her rights under that statutory section are simply those accruing to her under established common law rules. *Nelson v. Nelson,* 512 S.W.2d 455 (Mo.App.1974).

The key question as to whether a transfer is in fraud of marital rights turns upon the intention of the husband-transferor. *Nelson v. Nelson, supra; In the Matter of the Estate of August LeGarce,* 532 S.W.2d 511 (Mo.App.1976); *Merz v. Tower Grove Bank & Trust Co.,* 344 Mo. 1150, 130 S.W.2d 611 (1939). In an effort to show an intention to defraud, Arzetta argues strenuously again that the annuity promised to Arzetta was "shockingly inadequate" as compared to the value of the stock. As already discussed earlier in this opinion, there was no shocking inadequacy, nor indeed any inadequacy at all. The trial court properly declined to find any fraudulent intent on the part of Hathman. *Murphy v. Carron, supra.*

Affirmed.

All concur.