

# In the Missouri Court of Appeals
## Eastern District

### DIVISION THREE

| | | |
|---|---|---|
| In the Estate of | ) | |
| | ) | |
| WILLIAM J. McKENNA, | ) | No. ED103054 |
| | ) | |
| Deceased. | ) | |
| _____ | ) | |
| | ) | |
| KAREN L. McKENNA, | ) | |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court of |
| | ) | St. Louis County |
| vs. | ) | 11SL-PR03332-01 |
| | ) | |
| KAREN LYNNE HILGERT McKENNA, | ) | |
| KEVIN J. McKENNA, PAUL | ) | Honorable Carolyn C. Whittington |
| SHERIDAN, S.J., Trustees of the William | ) | |
| J. McKenna 1993 Trust, et al., | ) | |
| | ) | Filed: June 30, 2016 |
| Respondents. | ) | |

### OPINION

Karen L. McKenna ("Widow") appeals that part of the trial court's judgment which denied her petition to set aside transfers by her spouse, William J. McKenna ("Decedent"), of various assets into his trust (the "McKenna Trust") that she claims were made in fraud of her marital rights, and that part of the judgment which ordered that she receive no elective share of Decedent's estate

under section 474.160.1(1)[1] because despite the challenged transfers, she received from Decedent

upon his death an amount of money and property that under section 474.163[2] completely offset

---

[1] All statutory references are to RSMo (Supp. 2012) unless otherwise indicated. As relevant here, section 474.160.1 provides:

> When a married person dies testate as to any part of his estate, a right of election is given to the surviving spouse solely under the limitations and conditions herein stated: (1) The surviving spouse, upon election to take against the will, shall . . . if there are lineal descendants of the testator . . . receive one-third of the estate subject to the payment of claims.

[2] Section 474.163 provides in relevant part:

> 1. For the purposes of section 474.160, the estate consists of all money and property owned by the decedent at his death, reduced by funeral and administration expenses, exempt property, family allowance and enforceable claims, and increased by the aggregate value of all money and property derived by the surviving spouse from the decedent by any means other than testate or intestate succession, exempt property or family allowance without a full consideration in money or money's worth. The aggregate value of money and property so derived by the surviving spouse from the decedent shall be offset against the elective share given by section 474.160.

> 2. Property derived from the decedent includes, but is not limited to:

> (1) Any beneficial interest of the surviving spouse in a trust created by the decedent during his lifetime;

> (2) Any property appointed to the spouse by the decedent's exercise of a general or special power of appointment also exercisable in favor of persons other than the spouse;

> (3) Any proceeds of insurance, including accidental death benefits, on the life of the decedent attributable to premiums paid by him;

> (4) Any lump sum immediately payable, and the commuted value of the proceeds of annuity contracts under which the decedent was the primary annuitant, attributable to premiums paid by him;

> (5) The commuted value of amounts payable after the decedent's death under any public or private pension, disability compensation, death benefit or retirement plan, exclusive of the Federal Social Security system, by reason of service performed or disabilities incurred by the decedent[.]

2

the share of the estate Widow would otherwise have received under section 474.160 as a result of her election to take against Decedent's will.

Widow contends that the trial court erred (1) by giving effect to the unenforceable prenuptial agreement she and Decedent had entered into just before their wedding; (2) by misapplying the law when it ruled that Decedent satisfied his marital duty of candor in connection with the transfer of his Goldman Sachs accounts into the McKenna Trust; (3) by failing to apply the equitable principle of undue influence in connection with Widow's challenge to Decedent's transfers of their home and condominium into the McKenna Trust; and (4) by calculating Widow's beneficial interest in the "Marital Trust," a trust funded by the McKenna Trust, to be equivalent to the total value of its assets.

We deny Widow's claims of error and affirm.

### Factual and Procedural Background

Decedent and Widow were married on August 6, 1988. They remained married until Decedent's death on October 23, 2011. Widow met Decedent while they worked at Kellwood Corporation in St. Louis, Missouri. Decedent was President of Kellwood and Widow worked in Kellwood's accounting department.

Widow was aware that Decedent was a widower and that he had four children from his prior marriage to Jean McKenna, who died in 1985. When Decedent and Widow became engaged to be married in March 1988, Decedent advised Widow that he wanted her to sign a prenuptial agreement to protect the interests in his estate of his four children from his prior marriage. Thus, on July 7, 1988, Decedent and Widow executed a prenuptial agreement.

3

## The Prenuptial Agreement

At the time the prenuptial agreement was executed, Decedent's net worth was approximately $9 million. The prenuptial agreement provided, *inter alia*, that in exchange for Widow's waiver of "all rights which, by reason of the marriage, she may acquire in [Decedent's] property or estate," she would receive $1 million in consideration from his estate if he predeceased her. Widow testified that she felt pressured to sign the agreement because Decedent refused to keep their wedding date if she did not sign, and she did not want to face the shame and embarrassment of a cancelled wedding. Widow also testified that both before and at the time of signing the agreement, she did not receive any independent legal advice regarding the prenuptial agreement; she did not understand or receive an explanation of her marital rights under Missouri law; and she did not have the opportunity to fully and carefully read the agreement. In light of this testimony and the circumstances of the prenuptial agreement's execution, the trial court found the agreement to be unenforceable because the court was "unable to make . . . a finding" that the agreement was "not unconscionable."

Nevertheless, from the time the prenuptial agreement was executed until Decedent's death, both Widow and Decedent considered the agreement—under which Widow waived her marital right to an elective share of Decedent's estate upon his death—to be enforceable. Thus, when Decedent made the asset transfers Widow challenges here, he did not believe that he was depriving her of any interest in such property, since the prenuptial agreement provided that she would not acquire any interest in those assets as a result of their marriage, but would instead receive $1 million as consideration for waiving her marital rights to any interest in such property.

4

<u>The McKenna Trust, the Marital Trust, and the Challenged Transfers</u>

On December 20, 1993, as part of his estate plan, Decedent created the McKenna Trust. The McKenna Trust designated Widow and one of Decedent's sons, Kevin McKenna, as successor trustees upon Decedent's death. The McKenna Trust directed that upon Decedent's death, Widow would receive from the trust $1 million outright, representing the consideration under the prenuptial agreement; "all interests" in the real estate used by Decedent and Widow as their primary residence at or shortly before Decedent's death; and a beneficial interest in a "Marital Trust" worth $3 million and funded by the McKenna Trust. The McKenna Trust named Widow as the sole trustee and primary beneficiary of the Marital Trust upon Decedent's death, with their two children as residuary beneficiaries. The McKenna Trust provided that "the trustee" of the Marital Trust, Widow, "shall pay to [Widow] the income of the [Marital Trust] and in addition shall pay to [Widow] such amounts of the principal of the [Marital Trust] as from time to time shall be reasonably necessary for the support, maintenance and health of [Widow]."

Over the course of the following two decades, Decedent transferred various assets into the McKenna Trust. Between 1993 and 2007, Decedent transferred his Goldman Sachs accounts into the trust. And on February 8, 1995, after obtaining Widow's signature on the deeds of transfer, Decedent transferred their jointly-owned Chesterfield, Missouri home and Innsbrook, Missouri condominium into the McKenna Trust.

On July 24, 2007, Decedent executed a restatement of the McKenna Trust. The restatement named Paul Sheridan, S.J., Decedent's friend, as the third successor trustee upon Decedent's death. Further, the restatement altered some of the distributions Widow would receive from the McKenna Trust upon Decedent's death. Under the restatement, Widow would receive "all interests" in her and Decedent's primary residence at or near his death *as part of the Marital Trust*. She would also

5

receive "all interests" in the Innsbrook condominium as part of the Marital Trust, in addition to a beneficial interest in a separate $5 million in the Marital Trust reduced by the value of any life insurance benefits, retirement accounts, or employee benefit plans payable to Widow or the Marital Trust upon Decedent's death.

Widow's Knowledge of Decedent's Estate Planning and the Challenged Transfers

Widow knew, at least since 1993, that Decedent had a trust as part of his estate plan. As early as 1994, she attended meetings with Decedent's estate planning attorneys during which the provisions of the McKenna Trust were discussed, and she was present for the July 24, 2007, signing and explanation of the provisions of the restatement of the McKenna Trust.

From July 2007 onward, Widow had access to a copy of the restatement of the McKenna Trust. Moreover, Widow received and reviewed copies of Decedent's Goldman Sachs account statements, which subsequent to Decedent's transfer of the accounts into the McKenna Trust reflected that the title of the owner of the accounts had switched from him to the trust. And Widow was aware before Decedent transferred their home and condominium into the McKenna Trust that he was going to do so; she does not dispute that she signed the deeds of transfer prior to the conveyance.

There is no indication in the record that during Decedent's life, Widow objected—or, accordingly, that Decedent was aware of any objection by her—to his creation of the McKenna Trust; to its terms; to its restatement; or specifically to any of the transfers Decedent made into the McKenna Trust of *his* interests in the various assets he conveyed, on the grounds that the conveyance in any way infringed upon or defrauded Widow of her marital rights.

<u>Widow's Inheritance from Decedent Upon His Death</u>

Widow received the following distributions from the McKenna Trust upon Decedent's death: $1 million outright as consideration under the prenuptial agreement; the Marital Trust worth more than $4.5 million, which includes the home and the condominium; Decedent's $1.7 million Goldman Sachs IRA; life insurance benefits worth over $30,000; Decedent and Widow's $.5 million Goldman Sachs joint account; over $55,000 in their UMB Bank joint account; and automobiles, furniture, and furnishings worth over $64,000.

Widow's expert opined that her beneficial interest in the income of the Marital Trust—which he valued at $1,180,000—was so great that she would never need to invade the principal of the trust. Nevertheless, following Decedent's death on October 23, 2011, and Widow's assumption of her duties as trustee, Widow invaded the principal of the trust in 2013 and 2014.

The remainder of the assets of the *McKenna* Trust—which were valued at around $27 million—were, in accordance with the trust's terms, set aside for the benefit of Decedent's descendants living at the time of his death, including his children from his prior marriage. Upon Decedent's death, Widow sought to reach these assets as well. Together with her election to take against Decedent's will, she filed a petition to set aside the transfers into the McKenna Trust that she claims were made in fraud of her marital rights. With the petition, Widow requested that Decedent's assets conveyed into the McKenna Trust as a result of the challenged transfers—which assets include the Goldman Sachs accounts that make up the bulk of the trust's $27-million remainder not provided for Widow—be considered part of Decedent's estate for purposes of calculating her elective share.

The court denied her petition. The court also ordered that she receive no elective share of Decedent's estate under section 474.160.1(1) because, despite the challenged transfers, she derived

from Decedent by other means upon his death money and property in the amount of $7.9 million. The trial court found under section 474.163 that the aggregate value of the money and property she received completely offset the $3.3 million share of Decedent's estate Widow would otherwise have received under section 474.160 as a result of her election to take against Decedent's will. This appeal follows.

**Standard of Review**

In a court-tried case, we affirm the judgment below if it is supported by substantial evidence, is not against the weight of the evidence, and does not erroneously declare or apply the law. *In the Matter of S.J.M.*, 453 S.W.3d 340, 342 (Mo.App.E.D. 2015) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976)). Moreover, in this context we affirm the trial court's judgment if it is sustainable for any reason supported by the record. *Reagan v. Cty. of St. Louis*, 211 S.W.3d 104, 107 (Mo.App.E.D. 2006) (citing *Preferred Laser Servs., Inc., v. Abate*, 117 S.W.3d 678, 681 (Mo.App.E.D. 2003)). We view the evidence in the light most favorable to the trial court's judgment, disregarding all contrary inferences and evidence. *Id.* at 342-43 (citing *Woods ex rel. Woods v. Cory*, 192 S.W.3d 450, 458 (Mo.App.S.D. 2006)).

**The Failure of Widow's Claims of Transfer in Fraud of Marital Rights**

The common law of Missouri has long been that a spouse may not give away his property without consideration and with the intent and purpose of defeating the marital rights of the other spouse. *Nelson v. Nelson*, 512 S.W.2d 455, 459 (Mo.App. 1974). Section 474.150.1 codifies the common law action of fraud of marital rights by providing that "[a]ny gift made by a person . . . in fraud of the marital rights of his surviving spouse to share in his estate, shall, at the election of the surviving spouse, be treated as a testamentary disposition and may be recovered." *In re Estate of Brown*, 800 S.W.2d 137, 138 (Mo.App.E.D. 1990); *see also Reinheimer v. Rhedans*, 327 S.W.2d

8

823, 828 (Mo.banc 1959) (finding that the phrase "in fraud of marital rights" in section 474.150.1 was intended to adopt the meaning of that term as it existed at common law). Whether a transfer was made in fraud of the surviving spouse's marital rights is determined by the facts and circumstances that existed at the time of the transfer. *McDonald v. McDonald*, 814 S.W.2d 939, 946 (Mo.App.S.D. 1991).

Where, as here, there is no *direct* evidence of the decedent's intent to defraud, we look to certain "badges of fraud" to determine whether Decedent made the challenged transfers with fraudulent intent. *See Nelson*, 512 S.W.2d at 459-60. The badges of fraud that have been recognized as relevant to determining whether one spouse had the intent to defraud the other include: (1) the lack of consideration for the transfer; (2) the retention of control by the transferring spouse of the transferred property; (3) the disproportionate value of the transfer compared to the total value of the estate; and (4) the failure to make the transfer openly and with frank disclosure. *Estate of Fleischmann v. Fleischmann*, 723 S.W.2d 605, 610 (Mo.App.E.D. 1987) (citing *Matter of Estate of LaGarce*, 532 S.W.2d 511, 515-16 (Mo.App. 1975)).

However, in determining the decedent's intent courts may consider and weigh all the facts and circumstances in evidence. *LaGarce*, 532 S.W.2d at 515 (citing *Potter v. Winter*, 280 S.W.2d 27, 36 (Mo.banc 1955)). Accordingly, Missouri courts have considered other relevant factors in addition to the above four badges of fraud. *See, e.g.*, *id.* at 516-17 (considering, in addition to the four most commonly listed factors, whether the decedent made the challenged transfers in contemplation of death; the timing of the transfers in relation to the decedent's separation from his surviving spouse; whether, around the time of the transfers, the decedent placed jointly-held assets beyond her control; and the effects of the transfers on the reasonable expectations of the surviving spouse).

9

Turning to the circumstances of this case, we first address the impact on the badges-of-fraud analysis of Decedent's and Widow's mistaken but shared belief at the time of the challenged transfers that their unenforceable prenuptial agreement purportedly waiving Widow's marital rights was actually enforceable. We find that their belief that the prenuptial agreement was enforceable—shared for 23 years, from the date of execution of the prenuptial agreement until Decedent's death—is *highly relevant* to the fundamental question whether Decedent had the intent to defeat Widow's marital rights when he made the challenged transfers of assets subsequent to the agreement's execution. Further, because both Decedent and Widow thus believed Widow's marital rights had effectively already been "defeated" by the prenuptial agreement in exchange for $1 million in consideration from his estate if he predeceased her, we find, as the trial court did, that their shared belief *affirmatively demonstrates* that Decedent did *not* make the challenged transfers with fraudulent intent.

Decedent and Widow's 23-year belief that Widow had given up her marital rights in the assets in question also undermines Widow's argument that Decedent had the "objective intent" to defraud Widow because, she argues, the necessary consequence of his transfers of assets into the McKenna Trust was to defraud her. Widow relies on the quote from *Citizens National Bank of Maryville v. Cook*, 857 S.W.2d 502, 506 (Mo.App.W.D. 1993) (quoting *Citizens' Bank of Hayti v McElvain*, 219 S.W. 75, 77 (Mo. 1920)), that "if the necessary consequence of a conceded transaction was defrauding another, then, as a party must be presumed to have foreseen and intended the necessary consequences of his own act, the transaction itself is conclusive evidence of a fraudulent intent." We find this to be inapplicable to this case. Although *defeat* of Widow's marital rights was the necessary consequence of Decedent's transfers of various assets into the McKenna trust, *fraud* of her marital rights was *not* a necessary consequence. Again, because

10

Decedent believed the prenuptial agreement was enforceable, Widow failed to carry her burden of proving that he made the challenged transfers with *the intent to defeat Widow's marital rights*— Decedent believed Widow had already waived them. Therefore, the trial court did not err in denying Widow's petition to set aside Decedent's transfers.

For the reasons provided below, we reach this conclusion despite Widow's claims that the trial court, in denying her petition, erred (1) by giving effect to the unenforceable prenuptial agreement; (2) by ruling that Decedent satisfied his marital duty of candor in transferring his Goldman Sachs accounts into the McKenna Trust; and (3) by failing to apply the equitable principle of undue influence in connection with Widow's challenge to the transfers of the home and condominium into the McKenna Trust. Turning to these specific claims of error, we reject each in turn, beginning with Widow's argument that the court erred by giving effect to the prenuptial agreement.

The Unenforceable Prenuptial Agreement

To be clear, Widow does *not* claim that the trial court *explicitly* or *directly* enforced against her the prenuptial agreement after finding it to be unenforceable. Instead, Widow claims that by virtue of denying her petition to set aside Decedent's transfers as in fraud of her marital rights, the court *effectively* or *indirectly* enforced the unenforceable agreement.

We disagree because the trial court's judgment did not enforce or give any effect to the prenuptial agreement. The court denied Widow's petition *not* because the court enforced to any extent the prenuptial agreement but because Decedent believed at the time of the challenged transfers that the agreement was enforceable. The court found merely that, considered as a factual matter, his belief in the enforceability of the agreement, *correct or not*, demonstrated that he did not transfer assets to the McKenna Trust with the intent to defeat Widow's marital rights.

11

Despite these facts, Widow asserts error because she believes that the trial court's determination that Decedent did not make the challenged transfers with the intent to defeat her marital rights rests necessarily on its conclusions—which she faults—that Widow *reasonably* expected to receive from Decedent's estate only the consideration provided in the agreement for her waiver of her marital rights, and that "it was *reasonable* for . . . [Decedent] to subjectively believe that the prenuptial agreement was enforceable." (emphasis added). Because Missouri law, *e.g.*, *Potts v. Potts*, 303 S.W.3d 177, 187 (Mo.App.W.D. 2010), provides that a *person of common sense* would see the "strong, gross, and manifest" inequality in an unconscionable and unenforceable prenuptial agreement, Widow concludes that Decedent's belief in the enforceability of the agreement was unreasonable as a matter of law, and that the court should not have considered Decedent's belief in determining whether he made the challenged transfers in this case in fraud of Widow's marital rights.

We find, however, that regardless of the reasonableness or correctness of Decedent's belief (wholly shared by Widow) that the prenuptial agreement was enforceable, the trial court did not err in finding that belief to be relevant to the fundamental question whether Decedent had a fraudulent intent to defeat Widow's marital rights when he made the transfers at issue in this case. The evidence of Decedent's belief was relevant and represented substantial evidence upon which the trial court properly found that he did not make the challenged transfers with the intent to defeat Widow's marital rights. Point I is denied.

<u>Decedent's Marital Duty of Candor in Transferring His Goldman Sachs Accounts</u>

Widow argues that Decedent breached his marital duty of candor in connection with the transfers of his Goldman Sachs accounts into the McKenna Trust and thus displayed one of the

12

badges of fraud. We disagree and find that the trial court did not err in finding that Decedent complied with his marital duty of candor.

Widow rests her argument that Decedent failed to satisfy his marital duty of candor primarily on the principle from *Nelson*, 512 S.W.2d at 461, that because "[t]he marital relation involves the most unlimited trust and confidence[,] . . . [t]he lack of courage to submit a matter involving mutual interest to mutual consideration is an index to the state of mind of the [spouse transferring assets] to which the maxim that secrecy is a badge of fraud has peculiar application."

Widow claims—it turns out correctly, in light of the trial court's finding that the prenuptial agreement was unenforceable—that the transfer of Decedent's Goldman Sachs accounts was a matter of mutual interest that should have been submitted to mutual consideration. However, the record viewed in the light most favorable to the trial court's judgment in this case refutes any claim that Decedent "lacked the courage" to submit the transfer of the accounts to Widow's consideration.

The record shows that Decedent always believed that the prenuptial agreement Widow signed purportedly waiving her marital rights was enforceable. The record establishes that Decedent did not lack the courage—but simply never saw any need—to submit to mutual consideration the matter of conveying what, according to the unenforceable prenuptial agreement's terms, remained his distinctly *individual* interest in the Goldman Sachs accounts.

Widow also cites for support *Estate of Bernskoetter*, 693 S.W.2d 249, 253-54 (Mo.App.W.D. 1985), but that case does not buttress her claim of error here. In *Bernskoetter*, the surviving spouse had no idea until his wife died that she had been keeping secret from him information about the amount and location of a savings account in her and their daughter's name

precisely because she intended to transfer the savings to their daughter—and thus, the court found, defeat his marital rights—upon her death.

Widow suggests that she is like the surviving spouse in *Bernskoetter* in that she, too, could not have stopped her spouse from transferring assets without filing suit to stop the transfer, to recover the assets, or to dissolve her marriage, and thus that she likewise should not—as the *Bernskoetter* court held the surviving spouse in that case should not—have been forced to file suit to stop her spouse's transfer before she could otherwise have known that it was secretly intended to defeat her marital rights. But that gets the facts wrong in this case and ignores a major distinction from the facts in *Bernskoetter*.

Here, both Decedent and Widow believed until Decedent's death that Widow had waived her marital rights by signing their prenuptial agreement that was later found to be unenforceable. Widow did not, like the surviving spouse in *Bernskoetter*, discover upon her spouse's death that her spouse's transfers defeating her marital rights were *secretly intended to accomplish that result*. The record in this case shows that instead—as a result not of uncovering upon Decedent's death in 2011 any particular secret, but solely of reading the trial court's judgment in this case in 2015— she cannot have discovered anything more than that because the prenuptial agreement was actually unenforceable, Decedent's challenged transfers, including that of his Goldman Sachs accounts, had the mere *unintended effect* of defeating part of her marital rights. As stated above, the record in this case shows that Decedent believed Widow had waived such rights by agreement long before the transfer, precluding a finding that Decedent transferred the accounts with the intent to defeat her rights.

Finally, Widow faults one last aspect of the trial court's determination that Decedent satisfied his marital duty of candor. Widow claims the trial court misapplied the law by

14

considering the effects of the transfer of the Goldman Sachs accounts on her reasonable expectations in light of her belief in the enforceability of the actually unenforceable prenuptial agreement. Widow argues that because she did not actually or constructively acquiesce or consent to the transfer, the effects on her reasonable expectations were irrelevant, and the trial court erred in considering them. But Widow is mistaken. We reject her contention that *Bernskoetter* established that considering such expectations is relevant *only* for purposes of supporting a defense of actual or constructive acquiescence or consent to a challenged transfer. There is no such statement in *Bernskoetter*, and in *LaGarce*, 532 S.W.2d at 517, the surviving spouse did not acquiesce or consent to the transfer to another couple, by her husband and in fraud of her marital rights, of the value of several savings certificates of which she was the joint owner, but the court still properly considered, in determining whether the husband defrauded the surviving spouse, the effect of the transfer on her reasonable expectations. Point II is denied.

## The Issue of Undue Influence

Widow last contends that the trial court erred by failing to apply the equitable principle of undue influence in connection with Widow's challenge to Decedent's transfers of their home and condominium into the McKenna Trust. Undue influence is that influence which by force, coercion, or overpersuasion destroys a person's free agency. *See Watermann v. Eleanor E. Fitzpatrick Revocable Living Trust*, 369 S.W.3d 69, 75 (Mo.App.E.D. 2012). The burden to prove undue influence lies with the party asserting it. *See id.* A presumption of undue influence arises when substantial evidence shows: (1) a confidential or fiduciary relationship; (2) that the fiduciary obtained a benefit; and (3) some additional evidence supporting an inference of undue influence. *Id.*

15

Widow claims that Decedent, with whom she shared a confidential, marriage relationship, unduly influenced her by using his power over her, and by threatening her that he would take her out of his will and take away her children, in order to destroy her free agency and obtain her signature on the deeds of transfer for their home and condominium. Widow argues that as a result of being thus unduly influenced by Decedent, she did not freely join in his conveyances of their home and condominium into the McKenna Trust, even though she knowingly signed the deeds of transfer effectuating the conveyances. Therefore, she concludes that under Missouri law the transfers are deemed to be fraudulent, *McDonald v. McDonald*, 814 S.W.2d 939, 945 (Mo.App.S.D. 1991) (citing section 474.150.2) (holding that conveyances of *real* property by a married person are deemed to be fraudulent unless the surviving spouse joined in or provided her express written assent to them), and that the trial court erred in failing to set them aside as in fraud of her marital rights based on the equitable principle of undue influence.

We find, however, that the court did not err in failing to consider undue influence, since Widow waived the issue by failing to raise it until after the trial was over, and the issue was not tried by consent. "Even in a court-tried case, where no post-trial motion is required to preserve substantive issues for appellate review . . . we cannot address arguments that the appellant failed to raise at trial." *Arnold v. Minger*, 334 S.W.3d 650, 654 (Mo.App.S.D. 2011) (quoting *Pickering v. Pickering*, 314 S.W.3d 822, 835 (Mo.App.W.D. 2010)). Accordingly, Widow's reference *solely in post-trial briefing* to the issue of undue influence came too late—after the trial was over—to preserve the issue for appeal. The issue was preserved only if it was tried by consent, and upon review of the record, we find that Widow's post-trial brief reference to undue influence did not constitute trial of the issue by express or implied consent. *Cf. Bateman v. Platte Cty.*, 363 S.W.3d 39, 43 (Mo.banc 2012) (holding that the plaintiffs' reference solely in a post-trial brief to an issue

16

did not constitute trial of the issue by express or implied consent, since asserting an issue only after the trial is over cannot constitute trial by consent).

Widow argues that even though she did not specifically assert undue influence until she raised the issue in her post-trial briefing, she did *not* waive the issue because at trial she *introduced facts into evidence* supporting a finding that she was unduly influenced by Decedent when she signed the deeds to transfer the home and the condominium into the McKenna Trust. We are not persuaded. At trial, Widow introduced evidence that Decedent threatened to divorce her, leave her penniless, and seek custody of their children if she did not sign the deeds of transfer, but she presented these facts to support her argument rejected by the trial court that she signed the deeds when placed under *duress* by Decedent, not undue influence.

While the equitable principles of duress and undue influence are frequently pled together, they are not the same, and a party may have legitimate strategic reasons, based on facts or law, to plead and prove one but not the other. To claim duress, a person must be so oppressed from the *wrongful* conduct of another as to deprive him of free will. *Schmalz v. Hardy Salt Co.*, 739 S.W.2d 765, 768 (Mo.App.E.D. 1987). Thus, although it may be undue influence, it is *never* duress to do what a party has a legal right to do. *See, e.g.*, *Gott v. First Midwest Bank of Dexter*, 963 S.W.2d 432, 440 (Mo.App.S.D. 1998). For example, it is not duress to institute or threaten to institute civil suits based on what one views to be his or her legal rights. *Security Savings Bank v. Kellems*, 274 S.W. 112, 114 (Mo.App. 1925). Widow did not effectively claim undue influence by claiming duress.

And although, as Widow claims, the evidence of duress in the record could also have served as evidence of undue influence, under Missouri law that does not matter here. "To fairly say a party implicitly consented to try a new issue, such evidence should warn that a new issue is being

17

injected. Thus, the evidence in question cannot be relevant to any other issue before the trial court; it must bear solely on the new issue." *Allen Quarries, Inc. v. Auge*, 244 S.W.3d 781, 784 (Mo.App.S.D. 2008) (citing *City of St. Joseph v. St. Joseph Riverboat Partners*, 141 S.W.3d 513, 516 (Mo.App.W.D. 2004)). Accordingly, because Widow did not assert undue influence until after the trial was over, we find that she waived the issue. Point III is denied.

**The Complete Offset of Widow's Elective Share of Decedent's Estate**

In her fourth point on appeal, Widow argues that the trial court erred in ordering that she receive no elective share of Decedent's estate. Widow contends that the court erred in finding that her elective share was completely offset by the aggregate value of the money and property she received from Decedent's estate by other means upon his death; specifically, she claims that the court incorrectly calculated the value of one such property, her beneficial interest in the Marital Trust, to be equivalent to the total value of that trust's assets.

In Widow's view, her beneficial interest in the trust is actually rather limited. She acknowledges that the McKenna Trust provides that she is entitled to all the income of the Marital Trust, but she asserts that the terms of the McKenna Trust relating to the principal of the Marital Trust—which provide that she may invade such principal as "shall be reasonably necessary for [her] support, maintenance, and health"—limit her access to the trust principal to when she has depleted all her other available resources. We disagree.

Missouri statutes provide no specific guidance for valuing the "beneficial interest" of the surviving spouse in a trust for purposes of calculating her elective share, and Missouri courts have not provided a specific interpretation of the term "beneficial interest." Nevertheless, Widow argues that the *only* reasonable conclusion from the record in this case is that her beneficial interest in the Marital Trust is less than the total value of its assets because, she asserts, she can encroach

on its principal *only* when her other resources are insufficient to cover her expenses. We disagree with Widow's interpretation of the record and with her undervaluation of her interest in the Marital Trust.

In *Winkel v. Streicher*, 295 S.W.2d 56, 61-62 (Mo.banc 1956), the Missouri Supreme Court held that "when [language *directing* a trustee to pay to a beneficiary so much as is *necessary* for his or her support] is used the inference (in the absence of some indication to the contrary) is that the intent was for the beneficiary to receive his full support from the trust estate"—i.e., an "absolute gift of support and maintenance." (emphasis added). And where intent to make such a gift is present, "the private income of the beneficiary cannot be considered" in determining how much he or she may invade the principal of the estate. *Id.* at 61.

Here, the McKenna Trust provides specifically that "the trustee[, Widow,] *shall* pay [herself] the income of the Marital Trust and *shall* pay [herself] such amounts of the principal of the Marital Trust as from time to time shall be reasonably necessary for [her] support, maintenance and health." (emphasis added). Accordingly, in the absence of some indication to the contrary, we find that the trial court could reasonably have concluded that Decedent must have intended for Widow to receive her full support from the Marital Trust, and thus that her ability to invade the principal of the trust is not limited to when her other available resources are insufficient to cover her expenses.

Widow rejects this conclusion primarily because she claims that the McKenna Trust's provisions applicable to the Marital Trust are much like those of the testamentary trust in *Nationsbank, N.A. v. Tegethoff*, 18 S.W.3d 22, 26 (Mo.App.E.D. 2000), which did not make an absolute gift of support. However, there are critical differences between the provisions of the McKenna Trust applicable to the Marital Trust and the provisions of the *Tegethoff* trust.

19

In *Tegethoff*, this Court concluded that the testator did not intend to make an absolute gift of support to his children of the trust's assets precisely because the children's ability to invade the trust's principal was limited to when the trustees, *in their discretion*, found it necessary to make distributions of the principal to support the children. *Id.* The testamentary trust in *Tegethoff* merely "authorize[d] the Trustees to encroach upon the principal of the trust estate for the . . . education, maintenance, and support of [the] children[,] . . . *if [it became] necessary in the opinion of the Trustees*." *Id.* at 24 (emphasis added). Thus, the most critical difference between the provisions of the McKenna Trust applicable to the Marital Trust and those of the *Tegethoff* trust is immediately apparent—the McKenna Trust provides that Widow, as the trustee, "shall" (i.e., it *requires* that she) make payments to herself of the Marital Trust principal as shall be reasonably necessary for her support as a beneficiary, whereas the *Tegethoff* trust did *not* require a single distribution of trust principal to the children.

Further, unlike the *Tegethoff* trust, the McKenna Trust does not contain additional language authorizing "reasonable and necessary" encroachments "to provide against any emergency which may arise afflicting [the relevant beneficiary], . . . occasioned by sickness, accident, ill health, affliction, misfortune or otherwise." *Id.* In *Tegethoff*, 18 S.W.3d at 26, this Court concluded that "[i]f [the] testator had intended an absolute gift of support to [the children], the above referenced language would have to be completely ignored and considered surplusage, which would thwart testator's intention therein." Indeed, that may essentially be why Decedent did not include such language in the McKenna Trust; he may have understood that it would be redundant to authorize encroachments on the trust's principal to provide against emergencies affecting Widow when he had already required that the principal be distributed to her whenever reasonably necessary to provide for her support, maintenance, and *health*. At the least, we find that the provisions of the

McKenna Trust applicable to the Marital Trust and the provisions of the *Tegethoff* trust are critically different, and that comparing them does not convince us that the trial court could not reasonably have found that Decedent intended for Widow to receive her full support from the Marital Trust.

But that is not the end of Widow's objections. Widow also denies that Decedent intended for her to receive her full support from the Marital Trust because, separately from the gift of the Marital Trust, Decedent provided her with a "gift" of $1 million and named her the beneficiary of his $1.7 million Goldman Sachs IRA, in her view thus demonstrating a lack of intent for her to receive her full support from the trust. The record, however, shows that Decedent intended the $1 million not to be a gift of support but actually to be his *payment of consideration* to satisfy the obligation he believed he owed Widow under the terms of the unenforceable prenuptial agreement.

And to the extent that Decedent believed the IRA would provide income to Widow immediately after his death, the trial court could reasonably have concluded—especially in light of Decedent's *dictate* as settlor of the Marital Trust that Widow as trustee distribute to herself that part of the trust's principal that, from time to time, becomes reasonably necessary for her support— that his desire to grant Widow money and property separate from the Marital Trust did *not* conflict with his intent for Widow to receive her full *support* from the trust. It is manifest that not every disposition of property upon death to a surviving spouse is for support in times of need, since such dispositions may be made simply to reward or enrich, or even to indirectly provide for persons other than the beneficiary. And, more important, there is nothing in the record indicating that Decedent named Widow the beneficiary of his IRA specifically to support her in times of need.

Consequently, we reject Widow's claims that the trial court could not reasonably have found that Decedent intended for her to receive her full support from the Marital Trust, and that

21

she can encroach on the principal of the Marital Trust as reasonably necessary for her support without first depleting all her other available resources. There is substantial evidence in the record that Decedent intended for Widow to receive her full support from the Marital Trust. Widow is mistaken in claiming that the only reasonable conclusion from the record in this case is that her beneficial interest in the Marital Trust is less than the total value of its assets. Rather, the trial court had a reasonable basis in the record—the evidence of Decedent's intent to make an absolute gift of support to Widow—for calculating her interest in the Marital Trust to be equivalent to the total value of the trust assets.[3] Point IV is denied.

### Conclusion

For the reasons stated above, we affirm the judgment of the trial court.

_____
James M. Dowd, Judge

Robert M. Clayton III, P.J., and
Roy L. Richter, J., concur.

---

[3] We note that as trustee of the Marital Trust, Widow must carry out her fiduciary duties to the trust's residuary beneficiaries, and in doing so she may not treat as mere surplusage the language of the McKenna Trust directing her to distribute to herself *only* as much of the Marital Trust's principal as shall be "*reasonably necessary*" for her support—i.e., she may not invade the trust principal whenever she so desires, but only when it would not constitute a breach of her fiduciary duties to conclude that invading the principal is "reasonably necessary" for her support. That Widow is constrained by fiduciary duties to abide by the terms of the McKenna Trust does not mean, however, that Decedent did not intend for her to receive her full support from the Marital Trust. Instead, such constraints mean only that Widow may not turn Decedent's absolute gift of *support* into an absolute gift of assets to be distributed and dissipated for purposes and in amounts determined solely by Widow's whim.